WM. L. SEYMOUR AND WM. R. SIMPSON, APPELLANTS, VS.
CRESWELL ET ALS., COMMISSIONERS OF THE FREEDMEN'S
SAVING AND TRUST COMPANY, APPELLEES.

1. A bill of exceptions should contain only so much of the testimony
as is necessary to decide the questions raised by the exceptions.
Where, upon the face of the bill, it appears that a mortgage and a
record which was in evidence was omitted, this court will give every
benefit to the respondents which could reasonably attend such pa-
pers ; but if it appears from testimony in the record, (the authen-
ticity of which cannot be doubted,) that there is error, this court
will correct it.

2. Where the initial point of a survey is the bank of a river at a named
point, a plaintiff in ejectment, claiming that the land has extended
into the water beyond the original initial point named in his deed,
thus changing his boundary by leaving out lands lying beyond the
lines extended from the initial point, must prove the fact of en-
croachment of the land upon the water.

3. To constitute an adverse possession as against the true owner, where
a party under a mistake as to the boundaries of his deed claims
land not embraced therein, there must be an actual possession and
improvement of the land which lies outside of his boundaries.
This under the statutes anterior to the act of 1872.

4. As against the true owner, a plaintiff in ejectment, claiming title
founded upon a written instrument and a judgment or decree of a
court, to be deemed in adverse possession, must, under the statute
of 1872, (chap. 1869, laws,) have usually cultivated or improved it,
or have protected it by a substantial enclosure, or, if not enclosed,
have used it for the supply of fuel, or of fencing timber for the
purposes of husbandry, or for the ordinary use of the occupant.

5. The general rule in actions of ejectment that the claimant must re-
cover upon the strength of his own title, does not operate to pro-
hibit the acquisition of possessory rights which may be enforced in
ejectment between parties in cases where the true owner does not
intervene ; but a prior possession to be effective as against a mere
squatter or intruder in actual possession, must be an actual, una-
bandoned possession. The payment of taxes, surveying and map-
ping the lands, and executing a mortgage covering them, do not
constitute such possession.

Appeal from the Circuit Court for Duval county. The facts of the case are stated in the opinion.

*J. C. Marcey* and *C. L. Robinson* for Appellants.

*Cockrell & Walker* and *Judson W. Whitney* for Appellees.

MR. JUSTICE WESTCOTT delivered the opinion of the court.

A preliminary question is raised by the respondents as to the bill of exceptions in this case. The bill shows upon its face that the decree of foreclosure of the mortgage given by O. B. Hart to Cone, and the record in the suit of Howell and wife vs. Simpson, were used in evidence, and neither of these papers is in the record. Respondents contend that for this reason, and because the bill of exceptions does not purport by its recitals to contain the whole of the evidence, this court must presume that there was proper evidence to support the judgment, and it must be affirmed. As a matter of fact, the bill by its recital does purport to contain all of the evidence of each of the parties, and we must hold these recitals to be correct, except where, upon the face of bill, the contrary appears. The commencement of the bill follows the form prescribed by the rules of practice controlling the subject, and the recitals as to the testimony of each of the parties is in the form which implies that all of the testimony is in the bill. Immediately preceding the charge of the Judge, the bill recites that " the parties had submitted and concluded all their testimony and the several matters aforesaid." The bill also recites that "the plaintiffs submitted all their evidence as above herein set forth, and did then and there rest." This is entirely sufficient, according to the form prescribed by this court, and the forms followed under the English practice. Rules of Prac. Circuit

Courts, pp. 37, 38 ; Tidd's Forms, 329 ; 2 Steph. Nisi Prius by Sharswood, 1797.

Again, it is not necessary that a bill of exceptions should in all cases contain all of the evidence. In a large majority of cases it should not. It should contain only so much of the evidence as is necessary to present the legal questions raised. When more than this is inserted in the bill it is an irregularity, to be condemned as a departure from established practice, inconvenient and embarrassing to the court. 1 Black, 209 ; 6 Fla., 522. The omission of the decree of foreclosure of the mortgage of O. B. Hart to Cone will not authorize us to presume independent facts relating to title and possessions having no connection with such mortgage. In the treatment of this case we examine it upon the hypothesis that such mortgage was, in all respects, regular and proper, and that it authorized the decree of sale, and the sale had thereunder. So in reference to the record in the suit of Harrell and wife vs. Simpson to the extent that any matter in the record could be affected by it, we must and will make every presumption in favor of the respondents. This matter is not material in the decision of this cause. It concerns the questions raised as to parties plaintiff, and our decision is upon other grounds independent of any question which this record could affect. The deeds constituting the chain of title of each party are before us, and all the evidence bearing upon the question of possessions is in the bill. It is from these facts that our conclusion is reached. We must say, however, that we can see no excuse in this record for the negligence shown by the omission from the bill of the papers referred to. Thus disposing of the questions made in reference to the bill of exceptions, we reach the case as it is presented by the record.

The appellants in possession are sued in ejectment by the respondents to recover lots six and seven in block one hun-

dred and thirty-six, in the City of Jacksonville, with mesne profits, for their use and occupation. After trial, verdict and judgment for respondents, this appeal is prosecuted, and the case is here upon exceptions taken during the trial and to an order of the court overruling a motion for a new trial made by the appellants, against whom the verdict was found by the jury; the ground of the motion being that the verdict was contrary to the evidence.

The case is interesting, presenting, as it does, some very nice questions concerning the doctrine of title through adverse possession, and rights resulting from possessions without title.

· A general principle controlling in actions of ejectment is that the plaintiff must recover upon the strength of his own title, and not on the defects in that of his adversary. We first enquire whether, in view of this general rule, the respondents established by their evidence such a title to the premises. They insist that they did.

In treating this question we do not propose to make elaborate citations from the testimony, but to state our conclusions from repeated careful examinations of it.

The plaintiffs in the Circuit Court (respondents here) propose to trace their title to the heirs of Purnal Taylor, the claim being that under a deed from such heirs to Isaiah D. Hart, dated May 6, A. D. 1834, and a deed of Maria Hogans, dated the third day of December, A. D. 1851, the title to these lots passed to I. D. Hart, and that through regular conveyances from Isaiah D. Hart and other parties claiming through him, his and their rights were vested in them.

The land conveyed to I. D. Hart by the heirs of Purnal Taylor is indicated by sections, townships and named boundaries in chains, being described generally as " part of a tract of land granted by the Spanish Government to the

widow and heirs of Purnal Taylor, deceased, on the 13th of September, A. D. 1816, and surveyed by George I. F. Clark, Surveyor General, on the 21st day of February, A. D. 1817." From the evidence in the record, whether we disregard or consider the opinion of the Commissioner of the General Land Office of the United States as to the boundaries of the Hogan grant, which is objected to as not being admissible as evidence, the jury could have concluded, as we think they did, that the land described in the deed of the heirs of Purnal Taylor to I. D. Hart was embraced in this grant by the Spanish Government. This grant, which is called in the testimony the Hogan's grant, was confirmed by the Board of Commissioners for ascertaining claims and titles to land in East Florida on the 26th of April, A. D. 1824, to Z. Hogans and his heirs, (4 American State Papers, 171,) and was subsequently confirmed to Hogans by act of Congress of February 8th, 1827. 4 Stat. at Large, 202.

One of the witnesses for plaintiffs (R. N. Ellis), who had surveyed the grant, testified that it included the lots which are the subject of this controversy. Charles F. Smith, a witness for defendants, who was likewise a surveyor, testified that he had run the lines of the Hogan's grant, and that they did not embrace these lots. The jury believed the survey by Ellis to be correct and so found. It was a question of credibility, and we must adopt their conclusion. This, however, only establishes the right and title of the grantors of Isaiah D. Hart to these lots at the date of their conveyance to him in 1834. It does not establish any title in I. D. Hart, because the grant to him was of a "part" of the Hogan's grant. His title and his right, so far as they result from his deed, must be fixed by the boundaries of that deed. All the witnesses who testify as to the boundaries named in this deed swear that they do not embrace lots six and seven in block one hundred and thirty-six, the

land which is the subject of this suit. Plaintiffs' attorney, in explanation of this testimony, urges that "none of the witnesses pretend to say what changes had in forty-six years taken place in the banks of the river, or whether the present bank of the river is where the bank was, while we are all acquainted with the natural process of accretion and rescision constantly going on in rivers." The bank of this river is the initial point of the surveys made of the boundaries named in the deed of the heirs of Purnal Taylor to Isaiah D. Hart. If there has been sufficient accretion, it may be true that the north boundary as named in the deed would fall south of these lots at the time of the surveys by these witnesses, while at the date of the deed it may have embraced them, but there is in the record no evidence of either accretion or abrasion, and we are unable to see how, in the absence of any testimony upon the subject, we or the jury can say there was an addition to the bank rather than an abrasion of it. The burden was upon the plaintiffs to show that these lots were embraced within the boundaries named in this deed, and if the bank has encroached upon the water of the river to such an extent as to produce the result stated, the plaintiffs should have established it by testimony. This they have failed to do, and the necessary result is that there is not a particle of foundation in this record for the view that the land described in this deed embraced these lots. The result is that I. D. Hart never had the legal title to these lots by virtue of this deed, and not having the legal title there could be no legal seizin or possession incident to title in him, and he having no legal seizin or possession by title, the plaintiffs could not derive them from him. The deed from Maria Hogans does not purport to convey a title beyond her interest. The record discloses that she did not own the entire property but only a limited estate in it, and her deed can be no foundation

for a judgment awarding the entire property to the respond-
ents.    From what has been said it is clear that I. D. Hart
had no paper title to the property.

The next question to be considered is, did any right ac-
crue to him by virtue of any possession established by the
evidence.    For if such right did accrue, it vested in the
plaintiffs by virtue of the several conveyances through
which they claim, reaching as they do the estate of I. D.
Hart in the premises.

The only testimony bearing upon the matter of the pos-
session of this property anterior to the claim made to it by
the grantees of the executors of the will of I. D. Hart, is
that of C. L. Robinson who swears that for seventeen years
before 1874 the lands were unoccupied and covered with
brush and scrub.

There is no testimony showing that I. D. Hart even
claimed the property under this deed.    True it is that his
executors sold it as a part of the estate, but it certainly
cannot be seriously contended that this fact alone estab-
lishes any possession by I. D. Hart.    But, however this
may be, it is certainly true that the testimony does not show
any actual cultivation or possession of these lots by I. D.
Hart, and even admitting that he did simply claim the
land, this would not be sufficient to give him a possessory
right as against either the true owner or a mere squatter or
intruder.    Admitting that I. D. Hart claimed the land, no
right vested in him, and if he took possession it was a pos-
session of land outside of the boundaries of his deed taken
under a mistake as to their extent.    The rule as to such
possession, when considered with reference to the right of
the true owner, is that where a grantee in taking possession
under his deed goes unintentionally and by mistake beyond
his proper boundaries, and enters upon and actually occu-
pies and improves land not included in the deed, claiming

and supposing it to be his, this occupation is to be deemed adverse within the meaning of the statute of limitations, (reference is here made to the statutes in force anterior to the act of 1872, Chap. 1689, Laws,) and if continued the requisite length of time will bar the right of the true owner. 22 Penn., 139 ; 7 N. H., 457; 10 ib., 397; 1 A. K. Mar., 460 ; 5 Litt., 210 ; 6 B. Mon., 463 ; 22 N. Y., 170. There certainly was no such adverse possession as this in this case. In fact there is no evidence of any possession or even of any claim to these lots by I. D. Hart. Our conclusion, therefore, is that the evidence does not establish a prior possession in I. D. Hart of such character as would have been good even as against a mere squatter or intruder.

The next deed in the chain of title of plaintiffs is a deed of the executors of the will of I. D. Hart to O. B. Hart, dated the first day of June, A. D. 1866. This deed embraces the lots in question. The evidence as to possession under this deed is as follows :

J. C. Greeley, for plaintiff, says that he lived in Jacksonville in 1874, and knows the location of lots six and seven. The lots were unoccupied—not in the possession of any one except as other vacant lots. They were not fenced or cultivated, and that defendant entered into possession since A. D. 1874; that O. B. Hart mortgaged the land and claimed title; that he paid taxes to witness, who was Collector of Revenue at that time ; that in January, 1875, a fence was put around the lots by defendant Simpson.

F. F. L'Engle, for plaintiff, says that Hart employed him to survey the lots in the spring of 1866, pointing out these lots as the property of the estate of I. D. Hart, and that he made a map for Hart from which sales were made.

William Caulk, for plaintiff, says : That the heirs of O. B. Hart claimed these lands ; that no one was in possession

on November 2d, 1874, and that there was a part of a fence in 1866 put up by the government.

Defendants' witnesses, as to the matter of possession, testify substantially as follows; Charles F. Smith says that there was a fence in 1866 enclosing a small part of lot 6; that it enclosed a government burial ground; that no one was in possession in 1865; that lots six and seven were not cultivated until after 1875, and that in 1870 there was no fence.

Simpson, for defendants, testifies that he has had control of the lots for over three years; that there was a fence around lots six and seven when he went to reside on lot 5, which is a lot adjoining lot six; that he repaired the fence he found there, and that it is still there. This trial was had November 2d, 1879, which would place him in control of the lots before November 2d, 1876.

C. L. Robinson, for defendants, swears that Simpson has been possession of lots six and seven for nearly four years; that witness put the fence around these lots in 1874, and that they had not been fenced before; that they were cultivated by a tenant of his for the first time in 1875, and have been cultivated ever since that time.

The next deed in the chain of title of plaintiffs is the deed of a Master in Chancery who sold the interest of O. B. Hart to the plaintiffs. The sale was under a decree of foreclosure of mortgage, given by O. B. Hart to Cone. This deed of Durkee, the Master, is dated November 2d, 1874. We have thus presented the entire case of plaintiffs. We have seen that there was no title or adverse possession in I. D. Hart which he could transmit to O. B. Hart; that O. B. Hart claimed under color of title through a sale of I. D. Hart's interest under an order of court, and that plaintiffs claim through a sale of O. B. Hart's interest under an order of court; O. B. Hart paid taxes on the lots, executed a mort-

gage thereon, mapped them as his land, and, without any actual occupation, cultivation or enclosure, claimed them as vacant, unoccupied lots. We find no evidence of any act of ownership by the plaintiffs. They purchased November 2d, 1874, and Robinson, defendants' grantor, went into actual possession in 1874 or 5.

Robinson's grantor, Smith, who was a witness, states that he assumed ownership at the time of getting the deed; that by virtue of his deed he claimed lots six and seven, and sold them to Robinson in 1874. His deed to Robinson bears date January 10th, 1874. While Smith alludes in his testimony to his deed, he does not produce it, nor does he show any act of ownership or possession. It is not proved that he was even a squatter, or that he occupied any other relation to the land than simply to claim it. Not producing his deed, we must regard him as a mere claimant of vacant, unoccupied lands.

Thus stating the title and the evidence as to possession, the question is, did the plaintiffs make out a case giving them a right to a recovery? They certainly made out no title by virtue of any adverse possession as against the true owner. Their title was founded upon a written instrument and orders and decrees of courts authorizing sales of the land. From the first day of June, A. D. 1866, the date of the Master's deed to O. B. Hart, to 1874 or 5, when the persons through whom defendants claim took possession, gives us seven or eight years; but there is in the record no evidence of any actual cultivation or improvement of the lots by O. B. Hart or the plaintiffs, or of protection by a substantial enclosure, or if not enclosed, of use for the supply of fuel, or of fencing timber for the purpose of husbandry, or for the ordinary use of the occupant, or of any partial improvement. In the absence of any act of this character, there is, under the circumstances of this case,

covered as it is by section 6 of the statute of limitations, [Chapter 1869,] no adverse possession by O. B. Hart or the plaintiffs as against the true owner.

While this is true when the nature of an adverse possession as against the true owner is considered, it is still to be remarked that the general rule in actions of ejectment hereinbefore stated to the effect that the claimant must recover upon the strength of his own title, does not operate to deny or prohibit the acquisition of rights through prior possessions without good title. It is unquestionably true, as a legal proposition, that when the owner of the true title is quiet as to possession of parties, the law in some cases gives the first occupant and his grantees in possession a right to eject a subsequent possessor or his grantees. Nor do we see that the law of possessions, as thus stated, conflicts with the general rule that the plaintiffs must recover upon the strength of their own title if the matter is examined with strict, careful analysis, for the plaintiff who recovers by virtue of a proper prior possession recovers as much upon the strength of his own title as if he shows a good deed to the premises. The doctrine of title by adverse possession certainly embraces title without a deed in all respects conforming to legal requirements as to deeds unaccompanied by adverse possession. So a person who enters as tenant to one in possession without title cannot put his landlord to its proof. Prior possession or occupancy gave rights not only to the use but to the substance of the soil before there were any regulations by legislation of the method of transferring rights of this character by one person to another. At common law estates of freehold in lands passed by livery of seizin only, that is by delivery of actual possession. There is authority for this view, both sacred and profane. Even under the law prevailing in the land of the Philistines at the time Abraham was a sojourner therein, rights result-

ing from prior possession were claimed and enforced, for we find that Abraham, after digging a well and being violently dispossessed thereof by the servants of Abimelech, was restored to his possession and his right enforced. (Moses Reports, Book Genesis, chap. 21, v. 23 to 31.) Blackstone in his philosophical essay upon the natural right to soil by virtue of prior occupation, and the recognition of this right under the common law, says that "occupancy gave the right to the temporary use of the soil, and also the original right to the permanent property in the substance of the soil itself."

The rule as to rights resulting from prior possession we think is correctly stated by the Court of Appeals of Virginia, when it holds that where a party in peaceable possession of land is entered upon and ousted by one not having title to or authority to enter upon the land, the party ousted may recover in ejectment upon his possession only; and his right to recover cannot be resisted by showing that there is or may be an outstanding title in another, but only by showing that the defendant himself either has title or authority to enter under the title. 11 Gratt., 174. In the English cases of Read and Morpeth vs. Erington, Croke E., 1, iz., 321; Bateman vs. Allen, ib., 437; and Allen vs. Rivington, 2 Saund., 111, it was shown that the plaintiff was in possession, and that the defendant entered without title or authority, and the court held that it was not necessary to decide upon the title of the plaintiff and gave judgment for him. See also 14 Eng. Common Law, 41.

This doctrine seems to be questioned in some of the States of the Union, among which are Delaware, North Carolina, South Carolina and Indiana, but the decisions in Virginia, Georgia, Kentucky, California, New Jersey, Connecticut, Vermont, Ohio, Pennsylvania, Maryland and Texas sustain it, and we think the rule eminently calculated to preserve

peace in communities where there are vacant lands of which parties may take possession. For if the last possessor, even if by violence, is to be sustained, there certainly would be personal conflict. The possession which the law contemplates, in a case where plaintiff has no title, however, is an actual possession. Some of the authorities say " an open, notorious, exclusive and actual possession." In this case neither O. B. Hart, nor the plaintiffs who derive through him, had such actual possession. O. B. Hart paid taxes, had the land surveyed and mapped, and executed a mortgage thereon, but this is not the possession which gives the plaintiff in ejectment without paper title a right to recover. 6 Ohio, 165; 3 Har. & McHen., 621; 4 Dana, 463; 18 Ohio, 323; 5 Litt., 320. A plaintiff in ejectment without title cannot recover as against a mere intruder without title, if such plaintiff has not himself had a prior actual possession of the land. The defendants here claim, apparently, through a mere squatter without title, and the conveyances which constitute their chain of title are quit claim deeds. We deem it unnecessary to define the defendant's status here further than to say that his right is not less than that of a mere squatter, and hence that the plaintiffs under the law and the testimony in this case, as we have stated them, should not have recovered judgment. There should have been a new trial granted.

Judgment reversed and new trial awarded.

The appellee filed a petition for a rehearing, arguing as follows:

That the court in deciding that there was no evidence in the court below to sustain the verdict of the jury overlooked (owing, perhaps, to the failure of Mr. Walker, the counsel who argued for appellees, to call attention to it,) the omission from the transcript of the two maps of the

City of Jacksonville, which were introduced in the court below by the appellants.

Petitioners' counsel was of the impression that these maps had been sent up on application of appellants, and complained in his written argument of the action of appellants' counsel in that respect.

The bill of exceptions distinctly states that these maps were introduced in evidence. They are not, however, incorporated in, annexed to, or in any way made part of the bill; wherefore we submit that they were not before the Supreme Court, and that the court ought to presume upon familiar rules that this evidence, which was before the jury, was sufficient to show that the lots in controversy are embraced in the deed from Taylor's heirs to I. D. Hart. 23 Ala., 714; 30 Ala., 244.

But these maps did, in truth, in connection with the other evidence in the cause, establish the title of petitioners. At all events the jury so found, and the Judge, who had *all the evidence* before him, refused to disturb the verdict.

If the maps are in the Supreme Court, an examination of them will, we think, make this plain. If they are not before the court, then, if upon any reference that can reasonably be indulged as to what they would show the judgment can be sustained, it, we respectfully submit, should be.

Assuming that the court can consider these maps, we crave the leave of the court to brief the evidence in this connection. The deed from John Warren to Isaiah D. Hart, *25 Oct., 1829*. The tract therein conveyed is what is known as " *Hogan's donation*," as appears by the references in the deed to the sources of the title and the Am. State Papers. The *south boundary* called for in the deed is "lands *belonging to Lewis Z. Hogans* and John L. Doggett;" that is " *the Hogans' grant*."

The *26th May, 1834, Lewis Z. Hogans* and others, the

heirs of Purnall Taylor, conveyed to Isaiah D. Hart *part* of " the Hogans' grant ;" or, in other words, part of " the land belonging to Lewis Z. Hogans," which, by the deed of Warren in *1829*, was made the southern boundary of the lands therein conveyed.

Each of these grantors then understood that the northern and southern boundaries, respectively, of these two tracts were coincident. Ellis, the surveyor, testified that the southern boundary of the one is the northern boundary of the other, calling the one tract Hogan's Donation, and the other Hogan's Grant, and the jury so found. And we presume there can be no doubt that, upon the whole testimony, the jury were justified, or, at any rate, were not without support by evidence in finding that I. D. Hart, by virtue of two deeds, acquired a strip of land, being part of the Hogan's grant, having for its northern boundary the southern boundary line of Hogan's donation, and that the vacant lands not embraced in either the Hogan's donation or the Hogan's grant, (being the 15 acres of which the witness Smith " assumed ownership,") existed only in his fancy, fertilized by the ingenuity of avarice.

The testimony of Ellis shows, according to the verdict of the jury, indeed there is no dispute as to that, that Market street of the City of Jacksonville, from the eastern boundary of the Hogan's grant, or, as he expresses it, the dividing line between the *Hogan's tract* and the Masters or *Doggett's tract*, the deed from *Lewis Z. Hogans and Taylor's heirs* to Hart, bounds the land thereby conveyed on *the east* by lands *claimed by Doggett*.

So the jury having thus found the eastern boundary, and the southern boundary being the St. Johns river, they were also justified in finding the northern boundary to be the south line or boundary of the land conveyed by Warren to Hart, (the Hogan's donation); notwithstanding the lines

when run, according to the courses and distances called for in the deed, would not reach up to this northern boundary. " The certainty of metes and bounds will include and pass " all the lands within them, though they vary from the " given quantity expressed in the deed," and " the least cer- " tain and material parts of the description must yield to " those which are the most certain and material, if they " cannot be reconciled." 4 Kent's Com., 466. Now, the southern, eastern and northern boundary of the "*part*" of the " Hogan's grant" conveyed by Hogan's and Taylor's heirs, having been thus fixed by the jury, it only remains to be seen whether there was evidence tending to show that the western boundary of this part of the " grant" takes in block 136. We say this only remains to be done, because the witness Ellis says that Hogan's grant does embrace block 136, and the evidence generally sustains him. It appears, we submit, from the above review of the evidence, that we have got, by our deed, a strip running *the entire length from north to south* of this grant. So if our western boundary is far enough west, then our deed comprises, nec- essarily, this block. But having reached this northern boundary by running to the south line of the land pre- viously conveyed to us by Warren (the donation), the deed calls for the next line wholly by course and distance. The western boundary is " lands of the parties of the first part," and the location of this western boundary can *only be ascer- tained* by running from the east boundary of the part con- veyed at the point where it reaches the north boundary, running, we say, 26½ chains, or 1749 feet. Now, it appears from the maps introduced in evidence, and is well known to everybody within the jurisdiction of the court below, that the lots of the City of Jacksonville are of a uniform width of 105 feet, and the streets of 70 feet. It further appears from the maps that from Market street to Laura

street, which is the western boundary of block 136, there are 13 lots of 105 feet each, making 1365, add 3 streets, 70 feet each, 210 feet, and we have 1575 feet ; but the line we run is 1749 feet, so that it not only includes block 136, but goes 174 feet further to the west.

We submit that if this evidence, or this review of it, had been presented on the former hearing, the court might not have held that there was no evidence to support the verdict of the jury.

The witness, Ellis, who testified that block 136 *is in Hogan's grant*, and who also testified that it is *not* embraced in the deed to Hart, only meant, as we think is obvious from his testimony, that it is not embraced if the survey must be made according to the courses and distances given without reference to the boundaries called for.

What we have said above is upon the presumption that the maps will be considered by the court, although they are not in the bill of exceptions, or made part thereof by any appropriate reference. If they are not to be considered by the court, then we are entitled to every legitimate inference that the jury might have drawn from them, viewed in the strongest light for us.

And we respectfully ask to be further heard upon the point that where the bill of exceptions *purports* to set out all the evidence, and yet it is apparent that *it does not*, the same presumptions will be indulged in support of the judgment of the court below as would be in a case where the bill *did not purport* to set out all the evidence. It is indeed settled by the Supreme Court that the bill in this case does *purport* to set out all the evidence ; but that pretension of the bill is clearly *untrue* in respect of two important pieces of testimony (the Cone decree and the record in the suit of Howell and wife vs. Simpson), referred to by the court, and in respect of other pieces not adverted to in the opinion of

the court, viz : the Am. State Papers and *the maps of the City of Jacksonville and another map mentioned in the testimony of Davis*, and it would seem used in evidence. If there was other testimony not mentioned in the bill, we are not at liberty to say so. We can only refer to such omissions as are made apparent by the bill itself. We have faith, however, that upon a rehearing we would be able to satisfy the court that a bill of exceptions so defective as this cannot support the assignment of error " that the court erred in refusing to grant a new trial ;" that the ruling of the court upon a motion for a new trial ought not to be held error unless the party who complains of such ruling brings before the Appellate Court all the evidence—*a fortiori*, when it affirmatively appears that such party does not bring up all the evidence. The Judges of the courts below do not in practice narrowly examine bills presented by counsel when the bill *purports* to set out all the evidence ; so when they sign and seal a bill professing to set it all out, but which, when carefully examined in the Appellate Court, is found wanting, their action, as reported by the bill, is entitled to be protected by all fair and reasonable presumptions. One of these presumptions, it seems to us, is that if, manifestly, portions of the evidence, hurtful to the appellants, is omitted, other evidence equally hurtful may have been omitted, though such omission may not be apparent upon the face of the bill.

Mr. Justice Westcott delivered the following opinion thereon:

An application for rehearing is made in this case. Admitting our liability to err, we examine the matters suggested to correct the error if one is found to exist.

The principal ground urged in the petition is the alleged omission of certain maps and the fourth volume of Ameri-

can State Papers from the bill of exceptions, which maps and State papers were used upon the trial in the Circuit Court.

The maps referred to are mentioned in the bill of exceptions several times, and the original maps are on file in this court, accompanied by an order of the Judge and a certificate of the clerk that shows they were the originals used upon the trial of the cause. They are identified as maps "having thereon the lines and marks and boundaries delineated by the engineers and experts who testified in the cause."

The fact that a copy of so much of the American State Papers as was used in the trial is not embraced in the bill of exceptions, (another suggestion made,) we think immaterial. The bill shows that volume four of such papers was introduced upon the trial. Our attention is drawn to the matters therein which were deemed pertinent to this cause, and it is conformable to our practice here to refer to such matters when thus identified and referred to.

These papers were referred to by both parties, without exception, upon the hearing. They are referred to now in this petition, and certainly an objection of this kind is too late at this time.

In this case the jury evidently found that the north boundary of the land conveyed to I. D. Hart, through whom respondents claimed, was the north boundary of the Hogans' grant. Upon no other reasonable hypothesis could their verdict be sustained. Upon our then careful examination of the testimony, it not only did not sustain this conclusion of the jury, but such view was clearly *contrary* to the testimony. We examined the testimony and found that the north boundary of the land conveyed to Hart by Hogans and others did not embrace the lots in question, and upon this state of facts we announced the law without

expressly deciding what our view would have been if the facts were as contended for by respondents.

Have we made any mistake in this fact? The deed from Hogans and others to Hart, dated May 6, A. D. 1834, conveys " all that certain tract, piece or parcel of land lying and being within the following boundaries: that is to say, bounded on the east by lands now claimed by John L. Doggett, on the north by lands claimed by the said party of the second part, on the west by lands of the parties of the first part, (it being a part of the aforesaid tract,) and on the south by the St. Johns river. The first line begins on the banks of the aforesaid St. Johns river, and runs north forty chains ; the second line runs west twenty-six and a half chains, and the fourth line runs east twenty-six and a half chains to the point of beginning, containing one hundred and six acres, more or less. It being part of a tract of land granted by the Spanish Government to the widow and heirs of the said Purnall Taylor, deceased, on the 13th of September, A. D. 1816, and surveyed by Geo. I. F. Clark, Surveyor General, on the 31st day of February, A. D. 1817."

R. N. Ellis, the only witness for the respondent who is examined as to the question whether this deed embraced lots 6 and 7, says:

" This deed does not embrace the land in controversy, towit: lots six and seven, in block 136. I have surveyed the land described in said deed, commencing at the foot of Market street, thence north forty chains, thence west $26\frac{1}{2}$ chains, thence south forty chains into the river, thence east to the point of beginning. The survey made by me was from the description in the deed. The north end of the forty chains from the foot of Market street falls in lot five, block 95, as by the old numbers of the blocks. The north line of $26\frac{1}{2}$ chains, running west, is 300 to 400 feet south from lots 6 and 7, in block 136. The north line of the

Hogans' grant, by my survey, runs about seventy feet north of these lots." This witness states also that "the north line of the Hogans' grant and the south line of the Hogans' donation are the same line." According to this testimony it is clear that lots 6 and 7 were embraced in the Hogans's grant; and it is equally plain that the land covered by this deed does not embrace lots 6 and 7. Nor is there any uncertainty as to area. The deed states the land to be conveyed as 106 acres, more or less, and that is the quantity embraced in the boundaries given by courses and distances. Forty chains, or one hundred and sixty rods, is the distance north and south. The distance east and west is $26\frac{1}{2}$ chains, or 106 rods, and this gives us 106 acres. To extend the north and south line 350 feet, would give us one hundred and twenty-eight and one-half acres. There is certainly no principle of law applicable to these facts by which we can embrace in this deed more land in acres than it calls for, and at the same time extend the metes and bounds expressly named. It is apparent from the bill of exceptions that it contains all the testimony given upon this subject, and it is our duty to consider it and act upon it. We see no doubt about the matter. It is not a case of conflict of testimony. As to this matter, the verdict of the jury is contrary to the evidence.

Under these circumstances we cannot, as a matter of course, grant a rehearing.

The prayer of the petition is denied.